The PEOPLE of the State of Colorado, Complainant,

v.

R. Jerry BENNETT, Attorney–Respondent.

No. 90SA70.

Supreme Court of Colorado, En Banc.

May 6, 1991.

Linda Donnelly, Disciplinary Counsel, Denver, for complainant.

Michael D. Gross, Colorado Springs, for respondent.

PER CURIAM.

A hearing board of the Supreme Court Grievance Committee found that the respondent in this attorney discipline case entered into prohibited business transactions with a client, engaged in conduct involving dishonesty, and engaged in conduct prejudicial to the administration of justice. The board recommended that the respondent be suspended from the practice of law for three years. A hearing panel concurred in the findings and recommendation. Considering the seriousness of the misconduct, and taking into account certain aggravating factors including a history of prior discipline, we conclude that the recommendation of the hearing panel is appropriate and order that the respondent be suspended for three years, be required to pass the multi-state professional responsibility examination as a condition for reinstatement, and pay the costs of these proceedings.

I

The respondent was admitted to the bar of this court on April 14, 1964, is registered as an attorney upon this court's official records, and is subject to the jurisdiction of this court. C.R.C.P. 241.1(b).

The respondent and the disciplinary counsel entered into an unconditional stipulation of facts. In addition to the stipulation, the hearing board received exhibits and heard the testimony of witnesses called by the disciplinary counsel and the respondent. The hearing board found that the following facts were established by clear and convincing evidence.

In 1982 and 1983, the respondent performed miscellaneous legal services for Charles Perry and his wife, Martha Perry. The Perrys regarded the respondent as their family lawyer in 1983. The respondent, as attorney for Charles Perry, assisted Perry in winding up the affairs of Perry's insurance agency partnership. In May 1982, the respondent incorporated Perry Financial Services Corporation (PFSC). At that time, Charles Perry was the sole stockholder. The respondent and the respondent's wife were named to the board of directors of PFSC.

In 1983, Charles Perry offered to sell 40% of the corporation to the respondent in exchange for $25,000. The respondent paid Perry $5,000 in cash, gave Perry a demand promissory note for $20,000, and received the appropriate shares of stock. The respondent did not advise Perry that the two of them would have differing interests in the transaction nor did he make any other disclosures.

In August and September 1984, the Perrys still regarded the respondent as their lawyer and the respondent was still acting as corporation counsel for PFSC. In September 1984, Charles Perry offered to sell additional stock in PFSC to the respondent. After the transaction, the respondent would own 90% of the corporation and Perry would retain 10%. The respondent drew up the agreement for sale of the shares and suggested to Perry, that if he wanted to, he could take the agreement to another lawyer for review. The respondent did not tell Perry that they had differing interests in the transaction and he did not make any other disclosures.

The agreement drawn up by the respondent was executed on September 28, 1984. It provided for a total purchase price of $75,000, with $20,000 to be paid in two equal installments on specified dates, and the balance to be paid over five years in monthly installments. The agreement did not provide for a pledge of the stock or allow Perry to perfect any other security interest in the stock. The agreement also did not permit the recovery of attorney's fees in the event of a default in payment.

After making the initial $10,000 payment, the respondent defaulted on the remaining payments under the agreement. The respondent told Perry that he defaulted because he had been required to make large infusions in cash into the corporation to keep it afloat. Although no promissory notes were executed to reflect that these payments were loans to the corporation,

the respondent provided the hearing board with monthly balance sheets which contained the item "RJB loan." The respondent also had his bookkeeper reconstruct records reflecting the amounts of cash the respondent infused into the corporation and the amounts he periodically withdrew for reimbursement. The balance sheets rarely corresponded with the reconstructions.

Because of the respondent's defaults, Perry encouraged the respondent to sell the corporation. A sale was negotiated with Reichart–Silversmith, Inc. (R–S) and a contract was drawn up which provided for a down payment of $56,000 and periodic installment payments over a number of years. The closing was to take place between April 17–19, 1986. Perry retained another attorney in March 1986 to review the impending sale of the corporation. Perry and the respondent agreed that the closing would not take place unless there was complete agreement with respect to the manner in which the proceeds of the sale were to be split. The respondent testified that, before the closing took place, Perry and he fully agreed to a specific split of the down payment and installments and that Perry assented to the closing.

Perry testified that at the time of closing no agreement to split the proceeds had been reached, that he opposed the closing, and that he believed that the closing could not take place if he did not attend. The hearing board found that at the time of closing there was no agreement between the respondent and Perry.

The closing took place on April 17 or 18, 1986, without Perry. In anticipation of the closing, the respondent prepared and signed an extract of minutes reflecting a corporate resolution authorizing and directing the officers of the corporation to enter into the R–S contract to sell the book of business.[1] At the closing, R–S gave the respondent a check for the down payment in the amount of $56,000 which the respondent deposited into his law firm trust account. By the end of May 1986, and before reaching a settlement with Perry, the respondent spent $55,000 of the proceeds of the sale on matters unrelated to corporation business.

The respondent wrote to Perry, who was living in Arizona, that the closing had occurred. He enclosed the contract for the sale of the corporation, and an agreement he had drawn up for disposition of the proceeds of that sale, for Perry's signature. Also enclosed was a check for $9,500, which was supposed to be Perry's share of the down payment. Because no actual agreement had been reached between the respondent and Perry with respect to splitting the proceeds from the sale of the corporation, and the proposed agreement drawn up by the respondent was unacceptable to Perry, Perry refused to sign the documents and did not negotiate the check.

Perry filed a request for investigation of the respondent's conduct with the grievance committee in August 1986. Eventually, a settlement was reached between Perry and the respondent and an agreement was executed. After the matter was settled, the respondent sent Perry an "addendum agreement #2" which stated in part:

WHEREAS, the parties have resolved their differences regarding the sale of the assets of the Perry Financial Services Corporation.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, it is hereby agreed as follows:

. . . .

2. That [Perry] will forthwith submitted [sic] a written withdrawal of his complaint filed against [the respondent] with the Colorado Supreme Court Grievance Committee advising them that the matter has been satisfactorily resolved; that [Perry] and [the respondent] were not in an attorney-client relationship; that their disagreement was civil in na-

---

1. The disciplinary counsel charged in the complaint that the respondent's preparation of this extract was itself dishonest and violated DR 1–102(A)(4). The hearing board determined that the disciplinary counsel had not proven by clear and convincing evidence that preparation of the extract violated the disciplinary rule. The disciplinary counsel has not excepted to the board's finding.

ture; and [Perry] was not questioning [the respondent's] professional ethics.

The hearing board concluded that the respondent's conduct violated DR 5–104(A) (prohibiting certain business transactions between attorney and client); DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice). Because he violated the above disciplinary rules, the respondent also violated DR 1–102(A)(1) (a lawyer shall not violate a disciplinary rule), and C.R.C.P. 241.6(1) (any act or omission violating the provisions of the Code of Professional Responsibility is grounds for attorney discipline). The respondent has excepted to each of these findings by the hearing panel and board. We conclude that the findings of the panel and board are correct and are amply supported by the record.

## II

### Violation of DR 5–104(A)

Because of the fiduciary nature of the attorney-client relationship, and because of the very real risk that the self-interest of the lawyer will interfere with the lawyer's exercise of free judgment on behalf of the client, a lawyer may enter into a business transaction with a client only under limited circumstances. *People v. Denious,* 118 Colo. 342, 361–62, 196 P.2d 257, 266 (1948). These limited circumstances and conditions are contained in DR 5–104(A), which provides:

> (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The hearing board rejected the respondent's contention that there was no attorney-client relationship between the respondent and Perry in 1983 and 1984 when Perry offered to sell stock to the respondent. Before the sale of the stock, the respondent had served as the attorney for the Perrys and PFSC, and the respondent admits that an attorney-client relationship existed at that time. The Perrys regarded the respondent as their lawyer at the time of the stock transactions in 1983 and 1984. There was no evidence that the respondent, or the Perrys, explicitly terminated the attorney-client relationship prior to the sale of the stock.

An attorney-client relationship is "established when it is shown that the client seeks and receives the advice of the lawyer on the legal consequences of the client's past or contemplated actions." *People v. Morley,* 725 P.2d 510, 517 (Colo. 1986). The relationship may be inferred from the conduct of the parties. *Id.* The proper test is a subjective one, and an important factor is whether the client believes that the relationship existed. *In re Petrie,* 154 Ariz. 295, 299–300, 742 P.2d 796, 800–01 (1987).

Further, "[t]he attorney-client relationship is an ongoing relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on." *In re Weiner,* 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978).

The record supports the hearing board's findings that an attorney-client relationship existed between Perry and the respondent at the time of the 1983 and 1984 stock transactions and that Perry expected the respondent to exercise his professional judgment on Perry's behalf. The respondent and Perry, as buyer and seller, had conflicting interests in the transaction.

The issue is whether the respondent made full disclosure to Perry of the conflicts of interest inherent in the transactions and whether he saw to it that Perry received independent legal advice "or else ... received from him such advice as he would have been expected to give had the transaction been one between his client and a stranger...." *Denious,* 118 Colo. at 362, 196 P.2d at 266–67. *See also Weiner,* 120 Ariz. at 352, 586 P.2d at 197; *In re James,* 452 A.2d 163, 167 (D.C.1982) (full

disclosure under DR 5–104(A) requires a clear explanation of the differing interests of the lawyer and client, the advantages of seeking independent advice, and a detailed explanation of the risks and disadvantages to the client entailed in the business agreement).

The respondent did not make the full disclosure required by the disciplinary rule. He presses the argument in this court that his conduct did not violate DR 5–104(A) because Rule 1.8(a) of the Model Rules of Professional Conduct only requires that the terms of the transactions be fair and reasonable to the client.

■ This argument is without merit. Whether or not the respondent's interpretation of Model Rule 1.8(a) is correct, which we doubt, DR 5–104(A) and the cases construing that disciplinary rule govern the duties that a lawyer licensed in this state owes to a client before entering into a business relationship with the client. *See, e.g., People v. Broadhurst,* 803 P.2d 478, 479 (Colo.1990); *People v. Schubert,* 799 P.2d 388, 391 (Colo.1990); *People v. Lopez,* 796 P.2d 957, 960 (Colo.1990); *People v. Score,* 760 P.2d 1111, 1112 (Colo.1988); *People v. Martinez,* 739 P.2d 838, 843 (Colo.1987); *People v. Foster,* 733 P.2d 687, 688 (Colo.1987). We conclude that the respondent's conduct violated DR 5–104(A).

### III

### Violations of DR 1–102(A)(4)

The hearing board found that the respondent acted dishonestly, contrary to DR 1–102(A)(4), in the following ways: (1) by proceeding with the closing when Perry and he had agreed that there was to be no closing without a complete agreement regarding disbursal of the assets and the respondent knew that there was no such final agreement; and (2) by spending the down payment from R–S without proper corporate authorization and absent an agreement with Perry that the respondent could use the money for his own purposes. The respondent defends his actions by maintaining that an agreement had in fact

been reached to go ahead with the closing and to split the proceeds.

The existence or non-existence of an agreement between the respondent and Perry at the time of the closing turns only on the factual question of whether Perry told the respondent that he agreed to the respondent's terms and instructed the respondent to proceed with the closing. Perry testified that there was no such agreement.

■ When approved by the hearing panel, the board's factual findings are binding on this court unless, after considering the record as a whole, the findings are unsupported by substantial evidence. *People v. Garnett,* 725 P.2d 1149, 1152 (Colo.1986). The hearing board, when acting as a fact finder, has the duty to assess the credibility of evidence before it, controverted and uncontroverted. *People v. Distel,* 759 P.2d 654, 662 (Colo.1988). "In determining whether the board's findings are supported by substantial evidence, it is not within the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses." *Id.* The board's finding that there was no agreement between Perry and the respondent at the time of the closing is supported by substantial evidence in the record as a whole, and is binding on this court. *Id.* We conclude as did the hearing board that the respondent violated DR 1–102(A)(4).

### IV

### Violation of DR 1–102(A)(5)

■ The respondent also violated DR 1–102(A)(5) by requesting that Perry withdraw the grievance filed against him. *People v. Goldberg,* 770 P.2d 408, 410 (Colo. 1989) (asking former client that grievance charge be dismissed after settlement of civil action between attorney-respondent and client is reached constitutes conduct prejudicial to the administration of justice contrary to DR 1–102(A)(5)). We reject the respondent's contention that DR 1–102(A)(5) is violated only when the attorney *conditions* settlement of the civil action on

withdrawal of the grievance. *See Goldberg,* 770 P.2d at 410.

The respondent cites an opinion of the Professional Ethics Commission of the Board of Overseers of the Bar of Maine, but it does not help him. *See* Maine Professional Ethics Comm'n, Op. 66 (1986), *reprinted in* ABA/BNA Lawyers' Manual on Professional Conduct 901:4201–02 (1987) (a lawyer who has settled a legal malpractice claim may request as part of the settlement that the complainant inform bar counsel of the settlement or testify that a settlement has occurred). The respondent's request exceeded the conduct permitted by the Maine ethics opinion because it required Perry to make factual and legal representations to the grievance committee with which Perry did not agree. In addition, the respondent's request is contrary to the findings of the hearing panel and hearing board. We conclude that the respondent's request for withdrawal of the grievance complaint was prejudicial to the administration of justice in violation of DR 1–102(A)(5).

V

The hearing panel unanimously approved the recommendation of the board that the respondent be suspended from the practice of law for three years, and as a condition for reinstatement be required to pass the multi-state professional responsibility examination.

At the time the respondent closed the sale of the corporation and used the down payment for his own purposes without Perry's consent, he was corporate counsel as well as an officer and a director. Under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) (*ABA Standards*), in the absence of aggravating or mitigating factors, suspension is warranted "when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." *ABA Standards* 4.12.

We find that the following factors are present in aggravation: (1) prior disciplinary offenses including four letters of admonition and a private censure, *ABA Standards* 9.22(a); (2) a dishonest and selfish motive, *id.* at 9.22(b); (3) a pattern of misconduct, *id.* at 9.22(c); (4) multiple offenses, *id.* at 9.22(d); (5) a refusal to acknowledge the wrongful nature of his conduct, *id.* at 9.22(g); and (6) substantial experience in the practice of law, *id.* at 9.22(i). The hearing board found no mitigating factors.

The presence of these numerous aggravating factors, especially the history of prior discipline, coupled with the absence of mitigating factors, counsels a long period of suspension. Accordingly, we accept the recommendation of the hearing panel and conclude that a three-year suspension is appropriate. In addition, the instances of prior discipline and the positions taken by the respondent before the grievance committee in this proceeding warrant the requirement that the respondent pass the professional responsibility examination as a condition for reinstatement.

VI

■ It is hereby ordered that R. Jerry Bennett be suspended from the practice of law for three years, effective thirty days after the issuance of this opinion. C.R.C.P. 241.21(a). Bennett shall not be reinstated until after he has complied with C.R.C.P. 241.22(c) & (d). As a further condition of reinstatement, Bennett shall be required to pass the multi-state professional responsibility examination, given by the National Conference of Bar Examiners, or its successor, within six months prior to filing a petition for reinstatement. It is further ordered that Bennett pay the costs of this proceeding in the amount of $2,545.44 within ninety days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500–S, Dominion Plaza, Denver, Colorado 80202.